ANDREW JACKSON SALES v. BI-LO STORES, INC.

No. 8326SC662

(Filed 1 May 1984)

1. Courts § 21.5— action for unfair trade practices—what law governs

    The law of South Carolina governed an action for unfair trade practices since that state had the most significant relationship to the occurrence giving rise to the action.

2. Unfair Competition § 1— unfair trade practices—South Carolina Law—insufficient evidence on motion for summary judgment

    In an action to recover for alleged unfair and deceptive trade practices in which the law of South Carolina applied, the evidence before the trial judge on a motion for summary judgment failed to raise an issue as to any act or practice by defendant tending to deceive plaintiff where it showed that plaintiff and defendant had a business relationship whereby plaintiff maintained racks

with products from its various suppliers in defendant's retail stores; after defendant instituted an inventory reduction program, some managers of its stores refused to accept additional goods from plaintiff and began to return merchandise already in the stores; defendant told plaintiff that its inventory reduction program was not intended to apply to plaintiff's products; and defendant agreed to investigate and respond to plaintiff's concerns about the inventory reduction program and was prepared to do so, but plaintiff closed its business operations before defendant could work on the problem.

APPEAL by plaintiff from *Snepp, Judge.* Judgment entered 24 January 1983 in Superior Court, MECKLENBURG County. Heard in the Court of Appeals 10 April 1984.

This is an appeal by plaintiff from an order granting summary judgment for defendant on plaintiff's claim that defendant engaged in unfair and deceptive trade practices. The following facts are undisputed:

Plaintiff Andrew Jackson Sales (hereinafter AJS) is a North Carolina corporation that operates as a service agent for various suppliers of goods. Under its contracts with these suppliers, AJS obtains merchandise from the suppliers and delivers it to various retail establishments. AJS is responsible for setting up "racks" on which the goods are displayed and for maintaining these racks, keeping them fully supplied and removing damaged, dirty, or otherwise unsellable goods. The suppliers pay AJS a commission based on "net billings," defined as "total new goods placed in the store during the particular period less the returned items."

Defendant, Bi-Lo, Inc., is a Delaware corporation having its principal place of business in Mauldin, South Carolina. Defendant operates retail stores in North Carolina, South Carolina, and Georgia. Plaintiff and defendant entered into a business relationship "sometime prior to 1980," with AJS agreeing to deliver, set up, and maintain racks with products from its various suppliers in specific Bi-Lo stores. Bi-Lo was billed for these items by the suppliers. Plaintiff and defendant agreed that their business relationship could be terminated by either party at any time. They further agreed on a "100% guarantee policy," which provided that Bi-Lo could return any unsold items and receive a full refund from the supplier. Such returns, as mentioned above, reduced "net billings" and thus decreased AJS's total commission.

In early 1982 Bi-Lo instituted an inventory reduction program. In January AJS salespeople reported that some Bi-Lo store managers were refusing to accept additional goods, and in late March store managers began to return merchandise already in the stores. Faced with drastically reduced commissions because of the high rate of returns, AJS officials arranged a meeting with Bi-Lo personnel at Bi-Lo's home office in South Carolina. Present at that meeting, which occurred on 12 April 1982, were Gary Mauldin, president of AJS, Frank Dawson, a partner in AJS, Donald Lentz, director of merchandising at Bi-Lo, and Bob Wheeler, a buyer for Bi-Lo. Bi-Lo's inventory reduction and its effect on both plaintiff's and defendant's business was discussed by those present, and Mr. Lentz asked plaintiff's agents to document the problem in detail. Upon return to North Carolina, Mr. Mauldin prepared a letter, dated 13 April 1982, in which he identified six stores as "examples of our problems." Mr. Wheeler received this letter, and placed it in his files for discussion at his next weekly meeting with store operations and supervisory personnel, scheduled for 22 April. On the morning of 22 April he learned that AJS had discontinued their business operations.

Plaintiff appealed from grant of summary judgment for defendant.

*Hovis & Hunter, by B. Garrison Ballenger, Jr., for plaintiff, appellant.*

*Leatherwood, Walker, Todd & Mann, by Harvey G. Sanders, Jr., and Kennedy, Covington, Lobdell & Hickman, by William C. Livingston, for defendant, appellee.*

HEDRICK, Judge.

Plaintiff assigns error to the court's grant of summary judgment for defendant, contending that the "pleadings, affidavits and depositions presented to the Superior Court . . . present a genuine issue of material fact for determination by a jury." Before examining the merits of plaintiff's claim, we must determine what law governs the substantive aspects of this case.

[1] The traditional choice of law rule employed by our courts in deciding actions in tort is *lex loci delicti*, determined in turn by the place where the injury occurs. *Petrea v. Tank Lines*, 264 N.C.

230, 141 S.E. 2d 278 (1965). In actions involving unfair or deceptive trade practices, however, our courts have not followed this traditional rule, but have instead applied the law of the state having the most significant relationship to the occurrence giving rise to the action. *Michael v. Greene*, 63 N.C. App. 713, 306 S.E. 2d 144 (1983). *See also Santana, Inc. v. Levi Strauss and Co.*, 674 F. 2d 269 (4th Cir. 1982). Applying this rule to the facts of the instant case, we conclude that the law of South Carolina governs this action. Defendant's home office and principal place of business are located in South Carolina, and AJS's written "proposals" to Bi-Lo for supply of various products were directed, received, and accepted there. Four of the six stores identified in Mr. Mauldin's letter as "examples of our problems" are located in South Carolina, and the representations alleged to have been unfair or deceptive were made there. While North Carolina is not without connection to the parties and the subject matter of the suit, we think it clear that South Carolina has the more significant relationship and thus hold that the law of that state governs. We note in passing that resolution of this question is of no practical import, as our disposition of the case would be the same under North Carolina law.

The law of South Carolina regarding unfair trade practices, like that of North Carolina and many other states, is modeled on Sec. 5 of the Federal Trade Commission Act, 15 U.S.C. Sec. 45(a)(1) (1976). S.C. Code Ann. Sec. 39-5-20 provides:

(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(b) It is the intent of the legislature that in construing paragraph (a) of this section the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to § 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

[2] South Carolina has followed the federal courts in construing the statutory language broadly: "It is in the public interest generally to prevent the use of false and misleading statements in the conduct of business . . . and actual deception need not be shown; a finding of a tendency to deceive and mislead will suffice." *State ex rel. McLeod v. Brown*, 278 S.C. 281, ---, 294 S.E.

2d 781, 783 (1982) (quoting *United States Retail Credit Association, Inc. v. F.T.C.*, 300 F. 2d 212, 221 (4th Cir. 1962)). We thus frame the issue before us as follows: did the evidence presented to the trial judge raise a genuine issue of material fact as to whether defendant's representations to plaintiff had "a tendency to deceive and mislead?" For the reasons discussed below, we hold that the evidence raised no such issue, and affirm the court's entry of summary judgment for defendant.

We note at the outset that AJS does not contend that Bi-Lo's inventory reduction campaign constituted an unfair or deceptive trade practice. That either party could terminate its relationship with the other at any time is conceded by all. Plaintiff's contention is instead that Bi-Lo "made various representations to AJS concerning this inventory reduction campaign and then conducted itself in exactly the opposite manner." We think it critical to examine the representations allegedly made by Bi-Lo.

The record contains a deposition given by Mr. Gary Mauldin, president of AJS, who made the following statements:

> The only conversations that I had with Bi-Lo personnel, other than store managers, about the inventory reduction program were with Mr. Lentz and Mr. Wheeler. We went to Bi-Lo and talked to Don Lentz and Bob Wheeler about it in mid-April. . . . We told them what was going on, that the store managers had started refusing all orders. . . . [W]e wanted to know what the hell was going on, and it was killing our sales . . . and if it didn't stop, it would put us out of business.

Mr. Mauldin testified that Mr. Lentz responded by assuring him that "it was not meant for us, and if we would document every problem that we were having, he would stop it because it was not meant for Andrew Jackson Sales to cut back on their inventory."

The record shows that Mr. Mauldin responded to Mr. Lentz' request by writing a letter dated 13 April 1982, in which he identified six stores as "examples of our problems." The final sentence of that letter states: "Bob, this is a major problem for both, Bi Lo and Andrew Jackson Sales and a quick resolvement would be beneficial to all concerned."

Bob Wheeler's deposition contains the following uncontradicted testimony:

I did get a letter from them, that was the letter I received in April. As to whether I worked on the problem, I didn't have an opportunity to because of the letter—I meet with the Store Operations and supervisory people, the divisional people, once a week, on Thursday. That letter was placed in my files to review with Operations on the 22nd of April, that was the next available meeting to discuss that problem with them. It was that morning that I received a phone call that Andrew Jackson had already let their help go and would no longer be servicing Bi-Lo stores.

Stated simply, we think the evidence before the trial judge failed to raise an issue as to any act or practice by Bi-Lo "tending to deceive" AJS. On the contrary, we think the evidence clearly reveals that AJS made a business decision to continue dealing with Bi-Lo, a company providing more than 80% of AJS's monthly revenue, that Bi-Lo agreed to investigate and respond to AJS's concerns about the inventory reduction program, that Bi-Lo in fact prepared to do so, and that time ran out for AJS. The record contains no evidence that Bi-Lo guaranteed AJS that it would fully alleviate its problem within the week. Furthermore, while we do not hold today that the South Carolina statute protects only consumers against unfair or deceptive acts or practices, we do note that business entities such as the parties in the instant case are more sophisticated and certainly better equipped to protect themselves contractually than is the average consumer. We do not believe the South Carolina statute was intended to be an insurance policy against the exercise of business judgment which in hindsight shows itself to have been erroneous. Because the record contains no evidence of any act or practice by Bi-Lo that may be characterized as deceptive or unfair, we hold the court acted correctly in granting summary judgment for defendant.

Affirmed.

Judges ARNOLD and PHILLIPS concur.